# IN THE SUPREME COURT OF TEXAS

════════════

No. 13-0303

════════════

HARRIS COUNTY FLOOD CONTROL DISTRICT AND
HARRIS COUNTY, TEXAS, PETITIONERS,

v.

EDWARD A. AND NORMA KERR, ET AL., RESPONDENTS

══════════════════════════════════════════════════

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FIRST DISTRICT OF TEXAS

══════════════════════════════════════════════════

JUSTICE WILLETT, joined by JUSTICE JOHNSON, JUSTICE LEHRMANN, and JUSTICE BROWN, dissenting.

Harris County spent tens of millions of dollars on flood control measures. The only affirmative County conduct about which the Plaintiff-homeowners complain was the approval of subdivision plats for private development, a routine activity performed in every county. By Plaintiffs' own reckoning the flooding of their homes resulted from multiple causes. There is no evidence that the County was substantially certain its conduct would result in the flooding of Plaintiffs' particular homes, or that the County ever intended to use those properties in any capacity for flood control measures. I would hold that a cognizable takings claim is not presented. Today's decision will encourage governments to do nothing to prevent flooding, rather than studying and addressing the problem.

# I. Background

Plaintiffs consist of about 400 homeowners whose homes were located in the upper White Oak Bayou watershed of Harris County. The homes suffered flood damage one or more times during Tropical Storm Francis in 1998, Hurricane Allison in 2001, and another unnamed storm in 2002. Plaintiffs sued Harris County and the Harris County Flood Control District (collectively the County),[1] asserting a takings cause of action. The homeowners sued other defendants as well, including the Texas Department of Transportation, municipal utility districts, engineering firms, and private developers; those claims were settled or dismissed and are not presented for review.

Most of Plaintiffs' homes were built in the 1970s and early 1980s. Prior to the three flood events in issue, Plaintiffs' homes had suffered little or no flood damage, although the area has a long history of flooding. In 1976 the U.S. Army Corps of Engineers prepared an "Interim Report on Upper White Oak Bayou." The report was coordinated with numerous federal and state entities including the District, the Cities of Houston and Jersey Village, and the Harris County Commissioners Court. The report noted recurring flooding in the upper White Oak Bayou watershed, an area of 61 square miles. It described damaging flooding "occurring almost annually for the past several years." It stated that the flooding was "caused primarily by inadequate channel capacities of the streams," and that the problem was "compounded by continuing urbanization" of the fast-growing area. It predicted: "Additional residential development is expected to occur with or without an adequate plan for

---

[1] The Defendants contend their conduct with respect to flood control was coextensive, and Plaintiffs do not argue otherwise. Defendants present identical argument to us in combined briefing. Their briefing states that "[t]he District was the arm of the County that dealt with flood control," and at oral argument, counsel for Defendants stated that "the District really can't act without the County's approval. The County only acts in flood control through the District. . . . There may be different duties but in terms of their acts in this case they're absolutely coextensive."

controlling the floods. Although current local regulations require that new structures be built above the level of the 100-year flood, damages will increase substantially in the future with increased rainfall runoff rates." It proposed "enlargement, rectification, and partial paving" of the bayou and tributaries, together with other flood control measures. The plan was to be funded primarily by the federal government.

The County concurred with Corps' findings and agreed to act as a sponsor for the project, but federal funding was slow to materialize. The County approved new residential developments in the 1976–1984 period. The District began requiring new developments in the upper bayou watershed to provide on-site detention ponds. The parties disagree on the extent to which the District deviated from this policy. The District eventually hired Pate Engineers to develop a flood control plan, which was presented in a written report (the Pate Plan) in 1984. The Plan noted a "current policy requiring on-site stormwater detention on all new development projects in the Upper White Oak Bayou watershed," and proposed channel improvements combined with detention basins, with the goal of eliminating "the [100-year] flood plain in the upper portion of the watershed." The Plan stated that its implementation "should eliminate the existing flood plains through the existing developed portion of upper White Oak Bayou and provide for phased implementation of the ultimate plan to maintain 100-year flood protection on White Oak Bayou as future development occurs." In 1984, the County approved the Pate Plan and authorized the District to implement it. The Plan was to be funded through local taxes and impact fees, because federal funding was no longer available, and was to be implemented in phases. Developers who did not construct on-site detention facilities could pay an impact fee that would fund the construction of regional detention facilities.

The Pate Plan was never fully implemented, and flooding continued. In 1990 the District commissioned a new study by Klotz Associates to address flood concerns. The Klotz Plan called for measures that were different from the Pate Plan measures. The parties offer different characterizations of the shift from the Pate Plan to the Klotz Plan. The County contends the Klotz Plan was necessary because assumptions in the Pate Plan proved wrong, and that the Klotz Plan was more ambitious than the Pate Plan. Plaintiffs contend the Klotz Plan was less extensive than the Pate Plan for various reasons.

Plaintiffs claim the flooding of their homes was caused by the County's approval of "unmitigated" upstream development, combined with a failure to fully implement the Pate Plan. Their expert, Larry Mays, relied on alleged unmitigated development occurring in the 1976–1990 time frame.[2]

The County filed a combined plea to the jurisdiction and motion for summary judgment. The trial court grudgingly denied the motion,[3] and the court of appeals affirmed.[4]

---

[2] The beginning of the alleged unmitigated development is disputed. But the record is clear that the date the alleged unmitigated development ended was no later than 1990. Mays' first expert report on the 1998 Tropical Storm Francis flooding relied on a model of rainfall and runoff based on 1990 land use conditions, and asserted that "differences in flows that would result by updating to 1998 conditions are minimal." His second report, discussing the two later storms, asserted that "[t]he causations of flooding" of the two later storms "are the same as pointed out in my 2001 report for the Tropical Storm Francis." Mays also at least twice confirmed in his deposition that development after 1990 did not cause additional flooding, agreeing that "for those subdivisions that were developed between 1990 and 1998, you assumed that they did not contribute any additional flows into White Oak Bayou," and "it is fair to say that you have no evidence that development between 1990 and 1998 had any effect, any impact on the Plaintiffs' flooding in this case."

[3] The trial court felt obliged under the law of the case doctrine to deny the motion based on an earlier court of appeals decision, but stated that it found the appellate decision "contradictory to Aristotle's Posterior Analytics in as much as the opinion fiats the presupposition that foreknowledge of possible future flooding is evidence of a forewill to take when a Governmental entity elects to expend its financial resources on other venues rather than proscriptively expending funds on the project at hand (a traditionally exempt exercise of legislative discretion—arguably thus the robbery victim may sue for funds spent upon fire prevention and home fire victim for funds spent upon police protection)."

[4] 445 S.W.3d 242.

## II. Analysis

### A. General Principles of Takings Law and the Intent Element

Generally, plaintiffs seeking recovery for a taking must prove the government "intentionally took or damaged their property for public use, or was substantially certain that would be the result."[5] Sovereign immunity does not shield the government from liability for compensation under the takings clause.[6]

Much of our takings jurisprudence focuses on the required mens rea. We have made clear that a taking cannot be established by proof of mere negligent conduct by the government.[7]

### B. Other Elements of Takings Jurisprudence: Affirmative Conduct, Specificity, and Public Use

Much of the briefing focuses on the element of intent, but there are other elements of a taking that render Plaintiffs' claim problematic.

### 1. Affirmative Conduct

Our jurisprudence provides that only affirmative conduct by the government will support a takings claim. We have always characterized a takings claim as based on some affirmative "act" or "action" of the government. For example, in *Tarrant Regional Water District v. Gragg*, we held "that the requisite intent is present when a governmental entity knows that a specific *act* is causing

---

[5] *City of Keller v. Wilson*, 168 S.W.3d 802, 808 (Tex. 2005).

[6] *Gen. Servs. Comm'n v. Little-Tex Insulation Co.*, 39 S.W.3d 591, 598 (Tex. 2001). Like the Court's opinion, for convenience my references herein to "sovereign immunity" are to the related doctrines of sovereign immunity and governmental immunity.

[7] *City of Tyler v. Likes*, 962 S.W.2d 489, 505 (Tex. 1997).

5

identifiable harm . . . ."[8] In *Gragg* the damage to the plaintiffs' ranch was caused by the water district's affirmative acts of constructing a reservoir and releasing water from the reservoir's floodgates.[9] Or in *City of Dallas v. Jennings*, "the parties agree that only an *intentional act* can give rise to such a taking . . . There may well be times when a governmental entity is aware that its *action* will necessarily cause physical damage to certain private property, and yet determines that the benefit to the public outweighs the harm caused to that property."[10] A government cannot be liable for a taking if "it committed no intentional acts."[11] We have not recognized a takings claim based on nonfeasance. Plaintiffs conceded this point in their briefing to the trial court, stating, "One of the elements of an 'inverse condemnation' case that a plaintiff must prove is that the government performed intentional act(s)." This element is important in today's case because Plaintiffs have consistently based their claim on the *failure* of the County to fully implement the Pate Plan, *combined with* its alleged approval of "unmitigated" private development. Mays' third expert report, for example, assigns two causes for the flooding: "[u]nmitigated land development, approved by the County," and "[f]ailure of the [District] to fully implement the 1984 Pate Plan." But the law does not recognize takings liability for a failure to complete the Pate Plan, despite Plaintiffs' attempt to

---

[8] 151 S.W.3d 546, 555 (Tex. 2004) (emphasis added).

[9] *Id.* at 550, 552.

[10] 142 S.W.3d 310, 314 (Tex. 2004) (emphasis added). *See also id.* ("Our earlier jurisprudence has left open the possibility that liability may be predicated on damage that is necessarily an incident to, or necessarily a consequential result of, the *act* of the governmental entity.") (emphasis added, internal quotation marks omitted); *State v. Hale*, 146 S.W.2d 731, 736 (Tex. 1941) (holding that to be liable for a taking, the government must "*perform certain acts* in the exercise of its lawful authority . . . which resulted in the taking or damaging of plaintiffs' property") (emphasis added).

[11] *Likes*, 962 S.W.2d at 505.

6

somehow bundle that inaction with the affirmative conduct of approving development. Assuming all other elements are met, liability for the taking of Plaintiffs' properties can derive, if at all, from the County's affirmative acts of approving development.

## 2. Specificity

In addition, a specificity element runs through our jurisprudence. The caselaw indicates that in order to form the requisite intent, the government ordinarily knows which property it is taking. For example, *Jennings* describes the intent requirement as covering situations where "a governmental entity is aware that its action will necessarily cause physical damage to *certain* private property."[12] The government must know that "a *specific* act is causing *identifiable* harm" or know that "*specific property damage* is substantially certain to result from an authorized government action."[13] We have not recognized liability where the government only knows that someday, somewhere, its performance of a general governmental function such as granting permits or approving plats will result in damage to some unspecified property.

## 3. Public Use in this Anti-Regulatory Takings Case

This most certainly is not an ordinary regulatory takings case, one where the plaintiff complains that the government through regulation so burdened his property as to deny him its economic value or unreasonably interfere with its use and enjoyment.[14] Today's case does not fit this

---

[12] *Jennings*, 142 S.W.3d at 314 (emphasis added).

[13] *Id.* (emphasis added); *accord City of San Antonio v. Pollock*, 284 S.W.3d 809, 821 (Tex. 2009).

[14] *See Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 935 (Tex. 1998) ("A compensable regulatory taking can also occur when the governmental agencies impose restrictions that either (1) deny landowners of all economically viable use of their property, or (2) unreasonably interfere with landowners' rights to use and enjoy their property.").

body of takings jurisprudence and is in a sense its antithesis. First, Plaintiffs are not complaining about regulation of their property but regulation of other private properties. Second, the complaint is not excessive regulation, but insufficient regulation via the alleged approval of "unmitigated development." Plaintiffs similarly complain that in abandoning the Pate Plan the County did not regulate enough.

This uncharted theory should give the Court pause to ponder whether the claim, even if factually supported, is the stuff of a constitutional taking. If a private developer, after routine approval of its plat, uses its property in a manner causing damage to other properties, might the remedy lie against the developer rather than the county?[15] One can certainly argue that if the government's alleged affirmative conduct is nothing beyond allowing private developers to use their property as they wish, the more appropriate remedy is a claim against the private developers rather than a novel takings claim against the government. The homeowners in fact sued private developers and other private parties, and neither side contends that remedies against such parties do not exist.[16]

One way of analyzing this question is through the element of public use. Article I, section 17 of our Constitution provides for compensation where the property is "taken, damaged or destroyed for or applied to public use." We have recognized that a taking may occur "if an injury results from either the construction of public works or their subsequent maintenance and

---

[15] *See City of Keller*, 168 S.W.3d at 833 (O'Neill, J., concurring) (stating that review of subdivision plats "is intended to protect the city's residents; it is not intended to transfer responsibility for a flawed subdivision design from the developers to the municipality").

[16] *See id.* at 835 (O'Neill, J., concurring) ("[W]hen a private development floods neighboring land, the owner of the damaged property will ordinarily have recourse against the private parties causing the damage.") (citing TEX. WATER CODE § 11.086).

8

operation,"[17] but we have not held that the public-use element is met where the government does nothing more than approve plats or building permits for private development.

Plaintiffs argue that the public-use element is met here because we held it was met in *City of Keller v. Wilson*. That case is factually distinguishable. In *City of Keller*, the city adopted a master drainage plan that called for a drainage easement on land belonging to the plaintiffs, the Wilsons.[18] The easement was to contain a ditch, and the plan originally called for the city to condemn 2.8 acres of the Wilson property for construction of the ditch.[19] The ditch would traverse the Wilsons' property and other properties and terminate in a creek.[20] Developers were required to comply with the plan, and built a ditch on an adjacent property, the Sebastian property, but made no provision for a drainage easement across the Wilsons' property.[21] The city built a culvert to the creek, but it did not connect the ditch to the culvert as planned because neither the city nor the developers purchased an easement on the Wilsons' property, nor did they extend the ditch across the Wilson property as planned.[22] The result was that the Wilson property would flood when it rained.[23] Without any analysis of the public-use element, we agreed with the court of appeals that this element had been

---

[17] *Likes*, 962 S.W.2d at 505.

[18] 168 S.W.3d at 809.

[19] *See City of Keller v. Wilson*, 86 S.W.3d 693, 702 (Tex. App.—Fort Worth 2002), *reversed*, 168 S.W.3d 802 (Tex. 2005).

[20] *Id.*; *City of Keller*, 168 S.W.3d at 808.

[21] *City of Keller*, 168 S.W.3d at 808.

[22] *Id.*

[23] *Id.*

9

satisfied,[24] but we ultimately held that the intent element had not been established, due to lack of "proof that the City knew the plans it approved were substantially certain to increase flooding on the Wilsons' properties."[25]

*City of Keller* is factually distinguishable because the city there planned to condemn an easement and build a ditch across the plaintiffs' property, knowing drainage across that specific property was part of the master plan. The jury found that the failure to build that leg of the ditch resulted in flooding on the Wilson property. As the court of appeals reasoned:

> Clearly, had the City used its powers of eminent domain to condemn a portion of the Wilson property for an easement, that use would have been a "public use" to implement the City's Master Drainage Plan. The fact that the City chose not to condemn any of the Wilson property and to instead, in violation of the Plan, allow the water flowing from the Sebastian easement to discharge, uncontrolled, across the Wilson property shows that the invasion of the Wilson property by the water flowing from the Sebastian easement was for "public use."[26]

Hence, the public-use element as to the particular plaintiffs was not established merely by the approval of private development on other properties.[27] In today's case, there was no comparable proof that the County intended to purchase easements on Plaintiffs' particular properties and construct drainage facilities as part of a master plan, such that with or without such easements and drainage facilities runoff would under the plan traverse the plaintiffs' properties. The public-use

---

[24] *Id.* at 830.

[25] *Id.*

[26] *City of Keller*, 86 S.W.3d at 708.

[27] The court of appeals expressly held that "the City's liability is not based merely on its approval of the developer's plans." *Id.* at 701 n.2. *See also City of Keller*, 168 S.W.3d at 833 (O'Neill, J. concurring) ("[T]he City's mere approval of the private development plans did not result in a taking for public use, as the constitutional standard requires for a compensable taking.").

element was more apparent in *City of Keller* because with or without the easement and ditch the plaintiffs' land would by city design be available to carry runoff to the creek. Similarly, in *Gragg*, the defendant water district denied that it had inversely condemned ranch property by releasing water through reservoir floodgates, but counterclaimed for a flowage easement if the court found that the property had been inversely condemned. The trial court granted such an easement on the portion of the ranch subject to flooding.[28] And in *Kopplow Development, Inc. v. City of San Antonio*, when the City decided to build a detention facility it "knew the project would inundate part of [plaintiff] Kopplow's property before it ever began construction, prompting the City to seek a drainage easement from Kopplow."[29] In today's case, in contrast, whether viewed through the lens of intent or public use, there was no evidence that the County ever had designs on Plaintiffs' particular properties, and intended to use those properties to accomplish a specific flood control measure.

I also find the United States Supreme Court's landmark decision in *Kelo v. City of New London*[30] factually and legally distinguishable.[31] In *Kelo*, a city authorized a private nonprofit entity to condemn property as part of an economic revitalization plan.[32] The city claimed and the Court accepted that the public-use requirement was met because the plan would enhance the overall

---

[28] *Gragg*, 151 S.W.3d at 550.

[29] 399 S.W.3d 532, 537 (Tex. 2013).

[30] 545 U.S. 469 (2005).

[31] *Kelo* was a federal takings case, but we have recognized that federal and Texas takings jurisprudence are generally consistent. *See Hearts Bluff Game Ranch, Inc. v. State*, 381 S.W.3d 468, 477 (Tex. 2012); *Edwards Aquifer Auth. v. Day*, 369 S.W.3d 814, 838 (Tex. 2012).

[32] *Kelo*, 545 U.S. at 473–75.

economic health of the community.[33] But *Kelo* was not an inverse condemnation case like today's case. In *Kelo*, the government, through an agent, condemned plaintiffs' properties for an alleged public purpose. Indisputably the plaintiffs' properties were taken from them by government action. In today's case, where the only affirmative conduct that allegedly damaged Plaintiffs' properties was the approval of private development, there is in my view a real question whether a taking by the government even occurred, that is, whether the homeowners' claim even belongs in the world of takings jurisprudence and is properly analyzed as a takings claim.[34] In *Kelo* the plaintiffs argued that there *was no* public use within the ambit of the federal Takings Clause, in hopes of disallowing the taking of their land; here the Plaintiffs are in a completely different posture, arguing that the approval of private development *was* a public use, so as to establish that a taking within the ambit of the Texas Takings Clause actually occurred. In light of these factual and legal distinctions, *Kelo* does not compel a result one way or the other in today's case.

The Washington Supreme Court considered a case where plaintiffs filed an inverse condemnation claim against a county, alleging that plaintiffs' property flooded after the county approved a development plat for a neighboring property. The Court held that mere approval of the plat could not support a takings claim:

> If all the County had done was to approve private development, then one of the elements of an inverse condemnation claim, that the government has damaged the [plaintiffs'] property for a public purpose, would be missing. There is no public

---

[33] *Id.* at 483–84.

[34] I understand JUSTICE LEHRMANN's dissent to urge that if a taking for public use is compensable, then surely a taking for private use would also be compensable. I certainly agree. My point here, however, is to question, under the rubric of public use, whether the Court should recognize that a taking even occurred given the facts of today's case.

aspect when the County's only action is to approve a private development under then existing regulations. Furthermore, the effect of such automatic liability would have a completely unfair result.[35]

The approval of private development in this case—doing nothing more than allowing private parties to use their properties as they wish—presents at best a highly attenuated basis for meeting the public-use element of a takings claim. In light of this and other considerations, I find the claim legally deficient.

### C. The Unavoidable Tension Between Takings Jurisprudence and Sovereign Immunity

While compensation to those whose property is taken for public use is an important and constitutionally imposed obligation of democratic government, governments must also be allowed to survive financially and carry out their public functions. They cannot be expected to insure against every misfortune occurring within their geographical boundaries, on the theory that they could have done more. No government could afford such obligations. Justices Jackson and Goldberg both recognized that the Bill of Rights is not a suicide pact.[36]

This Court has repeatedly, recently, and unanimously recognized that strong judicial protection for individual property rights is essential to "freedom itself."[37] Locke deemed the

---

[35] *Phillips v. King Cnty.*, 968 P.2d 871, 878 (Wash. 1998).

[36] *Terminiello v. City of Chicago*, 337 U.S. 1, 37 (1949) (Jackson, J., dissenting) ("There is danger that, if the Court does not temper its doctrinaire logic with a little practical wisdom, it will convert the constitutional Bill of Rights into a suicide pact."); *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 160 (1963) ("[W]hile the Constitution protects against invasions of individual rights, it is not a suicide pact.").

[37] *Tex. Rice Land Partners, Ltd. v. Denbury Green Pipeline-Tex., LLC*, 363 S.W.3d 192, 204 (Tex. 2012).

preservation of property rights "[t]he great and chief end" of government,[38] a view we echoed almost

300 years later, calling it "one of the most important purposes of government."[39] Individual property

rights are a foundational liberty, not a contingent privilege. They are "fundamental, natural, inherent,

inalienable, not derived from the legislature and as preexisting even constitutions."[40]

But there is always tension between the compensation obligation of the Takings Clause and

the necessary doctrine of sovereign immunity, also a doctrine of constitutional significance.[41] We

long ago recognized that where government conduct caused damage to a plaintiff's property,

> One's normal reaction is that he should be compensated therefor. On the other hand, the doctrine of the non-suability of the state is grounded upon sound public policy. If the state were suable and liable for every tortious act of its agents, servants, and employees committed in the performance of their official duties, there would result a serious impairment of the public service and the necessary administrative functions of government would be hampered.[42]

### D. Application of Takings Law to the Facts Presented

Since inaction cannot give rise to a taking, we cannot consider any alleged failure to take

further steps to control flooding, such as the failure to complete the Pate Plan. Since a taking cannot

be premised on negligent conduct, we must limit our consideration to affirmative conduct the County

---

[38] JOHN LOCKE, SECOND TREATISE OF GOVERNMENT, Chap. IX, Sec. 124 (C.B. MacPherson, ed., Hackett Publishing Co. 1980) (1690).

[39] *Eggemeyer v. Eggemeyer*, 554 S.W.2d 137, 140 (Tex. 1977).

[40] *Id*.

[41] *See, e.g.*, *Alden v. Maine*, 527 U.S. 706, 733 (1999) ("Although the sovereign immunity of the States derives at least in part from the common-law tradition, the structure and history of the Constitution make clear that the immunity exists today by constitutional design.").

[42] *Tex. Highway Dep't v. Weber*, 219 S.W.2d 70, 71–72 (Tex. 1949).

was substantially certain would cause flooding to Plaintiffs' properties and that would not have taken place otherwise. The only affirmative conduct on which Plaintiffs rely is the approval of private development. Further, Plaintiffs offered no proof that the County was substantially certain Plaintiffs' particular properties would flood if the County approved new housing developments. Plaintiffs did not even assert such a claim, claiming instead that the County was substantially certain that its actions in approving "unmitigated development" would result in flooding "in the vicinity of Plaintiffs' properties." Plaintiffs never explained whether the "vicinity" is a few square miles or hundreds of square miles. They never identified precisely or even approximately the area of unmitigated development. The Pate Plan described the White Oak Bayou watershed as 110 square miles in size. Plaintiffs' expert Mays admitted that "I haven't been asked to do anything concerning specific plaintiffs." The County's expert, Melvin Spinks, agreed that "Mays was unable to demonstrate that any actions of Defendants were the proximate cause of flooding of any particular Plaintiff's property," nor did Mays "determine the causation of flooding subdivision by subdivision." In the trial court, the County accurately described Plaintiffs' particular parcels as "scattered in a checker board fashion in the upper White Oak Bayou watershed, stretching several miles."

Further, Plaintiffs offered no evidence that the County was consciously aware that approval of unmitigated development in one defined area, such as a specific block or neighborhood, was substantially likely to cause flooding in another specifically defined area of the White Oak Bayou watershed that included Plaintiffs' homes. The County offered evidence to the contrary. District Director David Talbott attested that "[t]he District did not approve of land development knowing that there was inadequate stormwater runoff mitigation associated with a particular development,"

15

and pointed out that the District was tasked with addressing severe flooding problems not only in the White Oak Bayou watershed where Plaintiffs resided, but also in the Clear Creek, Greens Bayou, Cypress Creek, and Brays Bayou watersheds. While Plaintiffs number 400 who suffered flood damage during three events, Talbott pointed out that Tropical Storm Allison alone flooded 73,000 residences. Talbott and the vice president of Klotz both attested that it is against District policy to "move a flood"—sparing one neighborhood that would otherwise flood by causing another neighborhood to flood. Talbott also attested: "Although White Oak Bayou was always a high priority, with limited District funding the District also had to consider other high priority projects throughout the County. District funds that were available were allocated to various projects around the County, with White Oak Bayou receiving an appropriate share."

This case is qualitatively different from recent cases where we recognized a taking, *Kopplow* and *Gragg*. In *Kopplow* the city "knew the project would inundate part of [plaintiff] Kopplow's property" and sought a drainage easement from Kopplow, the city's project resulted in only one other property being placed below the 100-year flood plain, and the city obtained a drainage easement on that other property.[43] In *Gragg*, one of the flood control district's experts acknowledged that his own modeling showed that higher than natural flooding would occur on the plaintiffs' particular ranch in 10 out of 16 floods, the district's records showed hundreds of releases by the district sufficient to cause flooding on the ranch, and there was evidence that the ranch had suffered "a large number of floods" after the district began the releases, whereas before the district's actions the ranch had never

---

[43] *Kopplow*, 399 S.W.3d at 537–38.

suffered from extensive flood damage.[44] In today's case, in contrast, the record is devoid of evidence the County knew, at the time it allegedly approved "unmitigated" development, that Plaintiffs' particular properties would suffer flooding. We recognized in *Jennings* that a taking occurs when property is "damaged for public use" in circumstances where "a governmental entity is aware that its action will necessarily cause physical damage to certain private property."[45] A conscious decision to damage certain private property for a public use is absent here.

The homeowners contend that *Kopplow* and *Gragg* are helpful to their case because both decisions recognized that the recurrence of flooding is probative on the issue of intent.[46] But we also held, in *City of San Antonio v. Pollock*, that when deciding intent in the takings context, "[t]he government's knowledge must be determined as of the time it acted, not with benefit of hindsight."[47] This rule limits the persuasiveness of Plaintiffs' argument. Plaintiffs alleged in their petition that "[m]ost, if not all of the plaintiffs herein, had never flooded before September, 1998," the Hurricane Francis flooding and the first of three floods about which they complain. Their recurrence argument to us is that "Plaintiffs' homes flooded three times in five years in 1998, 2001, and 2002." They contend these three flooding events are "probative evidence of intent under this Court's holdings in *Kopplow* and *Gragg*." But their expert, Mays, opined that the unmitigated development that caused

---

[44] *Gragg*, 151 S.W.3d at 550, 552.

[45] 142 S.W.3d at 314.

[46] *See Kopplow*, 399 S.W.3d at 537 (stating that "[w]ith flood water impacts, recurrence is a probative factor in assessing intent and the extent of the taking"); *Gragg*, 151 S.W.3d at 555 (stating that "[i]n the case of flood-water impacts, recurrence is a probative factor in determining the extent of the taking and whether it is necessarily incident to authorized government activity, and therefore substantially certain to occur").

[47] 284 S.W.3d 809, 821 (Tex. 2009).

17

the flooding of their homes ended no later than 1990, years before the three flooding events.[48]

Plaintiffs' recurrence argument is made with the benefit of hindsight.

The determination of whether a taking has occurred is ultimately a question of law for the court.[49] The determination does not always lend itself to simple rules and sometimes turns on the confluence of particular circumstances presented.[50] I would hold the homeowners have not presented a cognizable takings claim where (1) the County never desired to cause flooding, but desired only the opposite, (2) it undertook significant efforts to prevent flooding, spending tens of millions of dollars over many years, (3) the County never intended, as part of a flood control plan, to use Plaintiffs' particular properties for detention ponds, drainage easements, or the like, (4) the only affirmative conduct allegedly causing the flooding was approval of private development, (5) Plaintiffs offered no proof that the County was substantially certain that its approval of development would result in the flooding of Plaintiff's particular lots, and (6) even by Plaintiffs' reckoning the flooding resulted from multiple causes—Acts of God,[51] the activities of other

---

[48] *See supra* note 2.

[49] *City of Austin v. Travis Cnty. Landfill Co.*, 73 S.W.3d 234, 241 (Tex. 2002).

[50] For example, courts have recognized their inability to state a "set formula" for when regulatory takings occur. *Edwards Aquifer Auth.*, 369 S.W.3d at 839 (quoting *Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104, 124 (1978)). "The [United States] Supreme Court has frequently noted that whether a particular property restriction is a taking depends largely upon the particular circumstances in that case." *Hearts Bluff Game Ranch, Inc. v. State*, 381 S.W.3d 468, 477 (Tex. 2012) (brackets, internal quotation marks omitted).

[51] Their brief to us, for example, states the obvious: "Of course, without excessive rainfall no flooding would have occurred."

defendants,[52] the alleged failure to complete the Pate Plan, and the approval of private development. This is not a case where the government made a conscious decision to subject particular properties to inundation so that other properties would be spared, as happens when a government builds a flood control dam knowing that certain properties will be flooded by the resulting reservoir. In such cases of course the government must compensate the owners who lose their land to the reservoir.

I fear Plaintiffs' theory of takings, which the Court accepts, vastly and unwisely expands the liability of governmental entities. It would appear to cover many scenarios where the government has no designs on a particular plaintiff's property, but only knows that somewhere, someday, its routine governmental operations will likely cause damage to some as yet unidentified property. I would not embrace a new approach to takings that might effectively abolish much traditional fault-based tort law, swallow much of sovereign immunity, and disrupt the carefully crafted waiver of immunity found in the Tort Claims Act. We have stated that sovereign immunity is universally recognized and fundamental to the nature and functioning of government, and that we leave it to the Legislature to make changes to that doctrine, as it has done in the Tort Claims Act.[53] Therefore, I

---

[52] *See, e.g.*, *Kerr v. Harris Cnty.*, 177 S.W.3d 290, 295 (Tex. App.—Houston [1st Dist.] 2005, no pet.) ("Plaintiffs also sued Jones & Carter, an engineering company involved in the development of Brookhollow subdivision, alleging that Jones & Carter 'was negligent in failing to provide for adequate storm water detention/retention facilities or in some other manner [to] adequately mitigate the increased storm water runoff created in conjunction with their developments in the White Oak Bayou watershed upstream of Plaintiffs' properties.'"); *Kerr v. Tex. Dep't of Transp.*, 45 S.W.3d 248, 249 (Tex. App.—Houston [1st Dist.] 2001, no pet.) ("Plaintiffs specifically pleaded that TxDot's construction of feeder lanes on Beltway 8 and reconstruction of portions of Highway 290 in the 1980s and 1990s increased stormwater runoff that 'detrimentally impacted' plaintiffs, who were downstream of these activities."). As noted above, Plaintiffs also sued municipal utility districts and private developers.

[53] We have noted that sovereign immunity is "inherent in the nature of sovereignty" and "an established principle of jurisprudence in all civilized nations." *Wichita Falls State Hosp. v. Taylor*, 106 S.W.3d 692, 695 (Tex. 2003) (quoting The Federalist No. 81, at 487 (Alexander Hamilton) (Clinton Rossiter ed., 1961) and *Beers v. Arkansas*, 61 U.S. 527, 529 (1857)). "We have held . . . that the Legislature is better suited to balance the conflicting policy issues associated with waiving immunity." *Id. See also Tex. Natural Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 854 (Tex.

believe so sweeping an expansion of takings jurisprudence should be made only for the soundest reasons—reasons that escape me here—given the corresponding and massive contraction in the scope of sovereign immunity that would follow. While the right to compensation for a taking is constitutionally mandated, sovereign immunity is also a matter of constitutional significance.

Plaintiffs' notion of a taking, embraced by the Court, is expansive indeed. Take, for example, a government such as the City of Austin that supplies electric utility service to its citizens. It surely knows that in running power lines throughout the service area, fires or other damaging events will occasionally occur when acts of nature knock down lines or poles. Witness the recent devastating fires in the Bastrop area allegedly caused by power lines. The government also surely knows that some private properties—those adjacent to the lines, or, in Plaintiffs' vernacular, "in the vicinity" of the lines, are especially vulnerable to such damage. Under the Court's decision, an Act of God, such as a bolt of lightning, that causes a high-voltage line to topple or a transformer to blow, which in turn causes damage to a private property, is arguably a taking on the notion that properties near the grid have been "sacrificed" for the greater public good of providing electricity service to the whole community. Negligent maintenance of the utility grid is irrelevant, so long as the city is substantially certain that fires somewhere, someday, will occur along the grid, as surely is the case. It matters not that a storm contributed to the downed line, since in today's case storms also played an essential role. Traditional fault-based tort law, sovereign immunity, and the Tort Claims Act are

_____

2002) ("We have consistently deferred to the Legislature to waive sovereign immunity from suit, because this allows the Legislature to protect its policymaking function."); *Guillory v. Port of Houston Auth.*, 845 S.W.2d 812, 813 (Tex. 1993) ("Since the Tort Claims Act was passed in 1969, we have repeatedly held that the waiver of governmental immunity is a matter addressed to the Legislature.") (internal quotation marks omitted).

irrelevant if the claim is framed as a taking. The hypothetical is arguably a stronger case for a taking than today's case, since providing an electric utility grid is unquestionably a public use, whereas in today's case the only affirmative conduct allegedly resulting in a taking was granting approval of private development, perhaps not a public use at all.

Or take any large city, school district, or other governmental entity that has a fleet of vehicles. The government surely knows its vehicles regularly have accidents causing damage to private property. The government also surely knows that collisions will occur with greater frequency in certain areas, such as along bus routes or near the garbage truck depot, school bus lot, etc., where the government's vehicular traffic is concentrated. Under Plaintiffs' theory, each accident resulting in damage to private property in a higher-risk area would appear to be a compensable taking, again on the theory that this property has been "sacrificed" for the greater good of providing city-wide public transportation. The claim is arguably stronger than the claim in today's case, since (1) there is no Act of God that can be assigned at least part of the causation, (2) the city in the hypothetical is not just substantially certain but absolutely certain that accidents will occur, and (3) providing a city bus system is unquestionably a public use, unlike approval of private plats. No need to prove negligence on the city's part; the intent element is met because the city is substantially certain that accidents happen. No need to predict exactly where the accidents will occur, since in today's case the homeowners never contended or offered proof that the County formed any intent with respect to their particular properties. The plaintiffs' expert on the intent element conceded, "I haven't been asked to do anything concerning specific plaintiffs."

Or take any large city with its contingent of high-rise buildings. A city may know that somewhere, someday, a fire will occur on a floor the city fire trucks cannot reach. Suppose a city has a study in hand recommending larger ladder trucks, and suppose it fails to purchase the trucks due to funding problems or other priorities. Under the homeowners' approach, if a fire occurs on a higher floor of a building, and damages adjacent properties, those adjacent owners have a takings claim if they can show that a larger ladder truck would have contained the fire. It does not matter whether the city's conduct was reasonable given its tax base or funding priorities. In today's case, too, the record shows that funding issues played a role in the County's decisions. All that matters is that the city issued building permits, knowing that somewhere, someday, a fire would likely occur on an upper floor. This knowledge supplies the intent element, and the building permits supply the causation element, regardless of whether an act of nature started the fire. It does not matter whether the building in issue was privately owned, since according to Plaintiffs private ownership of the property approved for development is no bar to recovery.

Today's decision encourages governments to do nothing to prevent flooding, instead of studying and addressing the problem. As the Court recognizes, the homeowners do not urge the existence of a general legal duty on the part of the County to prevent flooding, breach of which would give rise to a private cause of action. Their claim instead is that the County failed to complete the Pate Plan and approved private development, behavior allegedly resulting in a taking of their properties. If various state and federal governmental entities had not commissioned and conducted detailed studies of regional flooding, the homeowners would have no basis for contending that the County was substantially certain of the link between development and flooding, and would not be

22

able to use that knowledge against the County. If the County had undertaken no efforts to control flooding, the homeowners could not assert the failure to complete the Pate Plan as a basis for liability.

### III. Conclusion

By accepting the homeowners' capacious, attenuated approach to takings, the Court unnecessarily expands takings liability. By framing their claim as a constitutional taking, the homeowners' claim is unbounded by any statutory caps on compensatory damages the Legislature might otherwise impose. I fear today's decision will make the government an insurer for all manner of natural disasters and inevitable man-made accidents.[54] It endangers the ability of governments to finance and carry out their necessary functions, the basis for sovereign immunity.

The plea to the jurisdiction was well-taken and should have been granted. I would reverse the court of appeals' judgment and dismiss the case.

_____
Don R. Willett
Justice

**OPINION DELIVERED:** June 12, 2015

---

[54] *See Phillips v. King Cnty.*, 968 P.2d 871, 878 (Wash. 1998) (holding that county is not liable for a taking if it only approves a private development plat, and stating: "If the county or city were liable for the negligence of a private developer, based on approval under existing regulations, then the municipalities, and ultimately the taxpayers, would become the guarantors or insurers for the actions of private developers whose development damages neighboring properties.").